IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JAMES MORDEN, et al., <br><br>                 Plaintiffs, <br><br> v. <br><br> XL SPECIALTY INSURANCE, <br><br>                 Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:14-cv-00224 <br><br> Judge Clark Waddoups |

This case arises out of James, Jenalyn, and Wade Morden's claims against Defendant XL Specialty Insurance (XL) for XL's alleged bad faith denial of insurance coverage and breach of its fiduciary duty to its insureds, Terry Deru and Belsen Getty, LLC (collectively, Belsen Getty). Before the court are the Mordens' motions for partial summary judgment on XL's fourth, ninth, eleventh, twelfth, sixteenth, twentieth, and twenty-third affirmative defenses (Dkt. No. 25), the Mordens' motion for partial summary judgment on XL's counterclaim for declaratory judgment (*id.*, p. 2), XL's Rule 56(d) motion (Dkt. No. 33), XL's cross motion for summary judgment on its fourth affirmative defense (Dkt. No. 30), the parties' motions and cross motions for summary judgment on XL's thirteenth affirmative defense (Dkt. Nos. 46, 50), and XL's motion for summary judgment on the Mordens' bad faith claims (Dkt. No. 53). The court held a hearing on all the motions, and permitted the parties to submit supplemental briefing. (Dkt. Nos. 67, 70, 72).

The court has carefully considered the parties' submissions, arguments, and relevant authorities. For the reasons that follow, the court finds that XL's claim denial was in error but that XL is entitled to judgment as a matter of law on the Mordens' bad faith claims. Accordingly, the court **GRANTS** XL's motion for summary judgment (Dkt. No. 53), **GRANTS** in part and

**DENIES** in part the Mordens' motion for partial summary judgment on XL's counterclaim (Dkt. No. 25), and **DENIES** as moot the remaining motions (Dkt. Nos. 30, 33, 46, 50).

## BACKGROUND

The following facts are undisputed for the purposes of the parties' motions for summary judgment. Belsen Getty, an investment advisement company, and Mr. Deru—Belsen Getty's director, managing member, and control person—had an insurance policy through XL that extended from October 9, 2010 through October 9, 2011 (the Policy Period). (Dkt. No. 29, p. 12).[1] The Policy has a limit of $1,000,000 for all claims filed in the Policy Period. (Dkt. No. 2, p. 4).

James and Jenalyn Morden were clients of Belsen Getty beginning in approximately 1990. Over an approximately twenty-year period, the Mordens met with Mr. Deru and made several investments with Belsen Getty through Mr. Deru. In general, the Mordens had a conservative portfolio. But beginning in approximately 2005 and continuing through 2009, Belsen Getty began making recommendations and investments that were unsuitable and/or did not match the Mordens and other investors' investment goals. For example, using Belsen Getty's discretionary authority, Mr. Deru purchased shares of stock in Nine Mile Software, Inc. for Mr. and Ms. Morden's account. (Dkt. No. 12-4, p. 5). But Mr. Deru did not disclose to the Mordens that Nine Mile was founded by Mr. Deru's son and Andrew Limpert, who was a member, direct owner, and control person of Belsen Getty from 2004 through 2008. (Dkt. No. 32-3, p. 4).[2] Mr. Deru also failed to disclose that Belsen Getty controlled Nine Mile's outstanding non-restricted stock. (*Id.* at p. 5). In addition, Belsen Getty recommended that

---

[1] There was also a prior policy that extended from October 2009 through October 2010. The parties agree this policy is not at issue.

[2] Mr. Deru's son was an investment advisor associated with Belsen Getty from 2000 through 2008.

investors invest in Axxess Funding Group, LLC, a company formed by Mr. Deru, his son, and Mr. Limpert, which was engaged in the business of secured real estate lending. (Dkt. No. 12-4, p. 6). Using Belsen Getty's discretionary authority, Mr. Deru purchased shares of Axxess stock for Mr. and Ms. Morden's account. (*Id.*, p. 6–7). But Mr. Deru did not disclose to Mr. and Ms. Morden that he had hired and paid his son, who had only a high school education, to perform functions related to Axxess, including managing and using investor funds. (*Id.*, p. 6). Mr. Deru also used investor funds in Axxess to loan himself up to $500,000 without obtaining the consent of Axxess investors. (*Id.*). In 2008, Mr. Deru, using Belsen Getty's discretionary authority, purchased shares of stock for Mr. and Ms. Morden's account in a corporation called ProFire Combustion, Inc. Mr. Deru did not disclose to Mr. and Ms. Morden that Mr. Limpert was the Chief Financial Officer of ProFire during that period of time.[3] Mr. Deru also failed to disclose that Belsen Getty controlled the non-restricted common stock of ProFire and that the stock was not freely tradeable. (*Id.*, p. 7).

Beginning in late 2008, Mr. Deru began encouraging Mr. and Ms. Morden, and their son, Wade, (collectively, the Mordens) to invest in a gold mine in Mexico. (*Id.*, p. 8). The investment would be in the form of a real estate loan, secured by water right shares in Southern Utah. (*Id.*, p. 9). Mr. Deru represented that the gold mine was owned and operated by Vermillion Holdings, LTD, a Nevada Corporation, and that the plant had secured all necessary permits and was "ready to go." According to Mr. Deru, it was a low risk investment. (*Id.*). On the basis of these representations, in May 2009 the Mordens transferred $500,000 to Vermillion. (*Id.*, p. 10). A few months later, Mr. Deru represented that the gold mine would be up and running in two-and-a-half weeks. The Mordens then invested an additional $500,000 into the mine. (*Id.* at 11).

---

[3] Prior to October 2008, Mr. Limpert was the CEO of a company called Flooring Zone. As the result of a reverse merger, Flooring Zone changed its name to ProFire. After the reverse merger, Mr. Limpert became ProFire's CFO. (Dkt. No. 12-4, p. 7).

Ultimately, however, the Mordens learned that the mine was not as Mr. Deru represented it to be. For example, it was not owned by Vermillion, was not operational, was subject to liabilities and obligations that had not been disclosed, and lacked the necessary permits. At the urging of Mr. Deru, the Mordens decided to take over operation of the mine, incurring significant additional costs in an effort to make the mine successful. (Dkt. Nos. 2, p. 3; 12-4, pp. 10–16).

In February 2009, the SEC began investigating Belsen Getty's potential violations of the Advisers Act and actions related to the sale of Nine Mile stock. (Dkt. No. 32-1, pp. 39, 54, 212–13). Although not initially the subject of the SEC's investigation, the SEC learned of ProFire, Axxess, and the Mexican gold mine in the course of its investigation. (Dkt. No. 32-3, pp. 2–14). Ultimately, the SEC issued formal administrative cease and desist proceedings. (*Id.*). The SEC matter was resolved when Belsen Getty and the SEC agreed to settle the case. (Dkt. No. 55-3, pp. 61–71). In the settlement agreement, the SEC found that Belsen Getty violated federal securities laws in connection with Nine Mile, Axxess, and ProFire; found that it violated the Advisers Act; ordered Belsen Getty to cease and desist from further violations; revoked Belsen Getty's registration; barred Mr. Deru from acting as a broker, dealer or investment adviser; and imposed disgorgement and civil penalties on Mr. Deru totaling $177,596.96. (*Id.*, pp. 61–71). The settlement made no reference to Vermillion or the Mexican gold mine. (*See id.*).

On October 7, 2011, the Mordens filed a complaint in Utah state court against Belsen Getty and Mr. Deru asserting claims for breach of fiduciary duty, unauthorized transactions, negligence, fraud, violations of the Utah Securities Act, and negligent infliction of emotional distress as a result of Belsen Getty and Mr. Deru's actions related to Nine Mile, Axxess, ProFire, Vermillion, and the Mexican gold mine (the Morden Claim).[4] (Dkt. No. 52-2, p. 131–158).

---

[4] In May 2011, the Mordens filed a third-party complaint against Mr. Deru and Belsen Getty in the case *Tabakh Group v. Vermillion Holdings, et. al.* (Dkt. No. 55-3, pp. 87–105). In this third-party complaint, the

Belsen Getty submitted the Morden Claim to XL, which denied the claim. According to XL, it had no obligation under the Policy to pay the Morden Claim because that claim arose from the same interrelated wrongful acts upon which the SEC's investigation was premised. (Dkt. No. 32-4, p. 62–69). Thus, XL asserted that the Morden Claim was deemed to have been made when the SEC began its investigation in 2009, prior to the Policy Period. (*Id.*, p. 68). The Mordens then submitted an offer to settle with Belsen Getty for the Policy Limits. (*Id.*, p. 94). When Belsen Getty's attorney forwarded the communication to XL, XL declined to settle for the same reasons it denied coverage. (*Id.*, p. 93–98).

Ultimately, Belsen Getty and the Mordens agreed to settle the Morden Claim. They prepared an Arbitration Award[5] providing that Mr. Deru and Belsen Getty were liable to the Mordens in the amount of $5,434,730. (*Id.*, p. 116–28). The parties also entered into an assignment agreement, whereby Belsen Getty assigned to the Mordens "any and all of their rights and claims that Belsen Getty and Deru may have against XL, of any nature or kind relating in any way to the claims at issue in the [Morden state] lawsuit, XL's handling of Mordens' claims against Belsen Getty and Deru, XL's rejection of Mordens' policy limits settlement offer, and the Arbitration Award." (*Id.*, p. 109).[6] Pursuant to this assignment, the Mordens filed the instant case alleging: 1) XL breached the implied covenant of good faith and fair dealing in its investigation and denial of the Morden Claim, and 2) XL breached its fiduciary duty to settle the

---

Mordens brought claims for common law fraud, violations of the Utah Uniform Securities Act, unjust enrichment, constructive trust, and replevin related to Mr. Deru's actions regarding Vermillion and the Mexican gold mine. The complaint did not make allegations related to Nine Mile, ProFire, or Axxess. (*Id.*, pp. 87–105). This complaint was dismissed shortly after it was filed. (*Id.*, pp. 108–109). The Mordens do not assert that the third-party complaint in the *Tabakh* action constitutes a claim under XL's policy. To the contrary, the Mordens rely only on XL's actions related to the complaint filed on October 7, 2011. (*See* Dkt. No. 25, p. 2 ("[N]o 'claim' was made on [the gold mine] investment until the Mordens filed a civil lawsuit in Utah state court on October 7, 2011."). Accordingly, the court treats the October 7, 2011 complaint as the relevant claim for the purposes of its analysis.

[5] Although titled "Findings of Fact, Conclusions of Law, and Arbitration Award," the case was never arbitrated.

[6] Claims that are not assignable are expressly reserved to Belsen Getty. (Dkt. No. 32-4, p. 109).

claim at Policy Limits because there was a substantial likelihood that there would be a judgment against Belsen Getty in excess of Policy Limits. (Dkt. No. 2, pp. 5–8). XL filed a counterclaim seeking declaratory judgment that no coverage existed under the Policy because the Morden Claim relates back to the SEC investigation. (Dkt No. 12, pp. 20–22). In turn, the Mordens filed a motion for partial summary judgment on XL's counterclaim on the basis that the SEC pre-Policy Period investigation does not constitute a claim under the Policy and that the Morden Claim does not arise out of wrongful acts interrelated with the SEC investigation. (Dkt. No. 25, p. 2, 5–7).[7] For its part, XL moved for summary judgment on the Mordens' bad faith claims. (Dkt. No. 53). Specifically, XL argues that even if the Morden Claim should have been covered by the Policy, XL acted in good faith in investigating and denying it. (*Id.*). The court first addresses the Mordens' motion for partial summary judgment on XL's counterclaim before turning to XL's motion for summary judgment on the Mordens' bad faith claims.[8]

## ANALYSIS

In considering the parties' competing motions for summary judgment, the court treats each motion separately, drawing all reasonable inferences against the party whose motion is under consideration. *See Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014) (at the summary judgment stage, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party"); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be

---

[7] XL also seeks declaratory judgment that there is no coverage for the Morden Claim by virtue of Policy Exclusion J, which excludes coverage for losses relating to Belsen Getty's rendering of investment banking services. (Dkt. No. 12, p. 21). Neither party has sought summary judgment related to this exclusion. Thus, the court does not consider it further.

[8] The Mordens also filed multiple partial motions for summary judgment on a many of XL's affirmative defenses. Because the court finds that XL's motion for summary judgment on the Mordens' bad faith claims disposes of the Mordens' complaint, it need not consider the partial motions and cross motions for summary judgment related to any of XL's affirmative defenses.

treated separately; the denial of one does not require the grant of another."). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A.  The Mordens' Motion for Summary Judgment on XL's Claim for Declaratory Judgment

As explained, XL seeks declaratory judgment that it had no obligation to pay the Morden Claim under the plain terms of the Policy. In support, XL argues that SEC pre-policy correspondence constitutes a "claim" under the Policy and that the Morden and SEC investigation arose from interrelated wrongful acts. Accordingly, XL asserts that the Morden Claim should be deemed to have been made in 2009, prior to the Policy Period.

In interpreting the Policy, the court looks to Utah law. *See Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (in diversity jurisdiction case, federal court applies the substantive law of the forum state).[9] In Utah, "Insurance policies are generally interpreted according to rules of contract interpretation." *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999). Thus, as it would with any other contract, the court must construe the Policy's provisions "by considering their meaning to a person of ordinary intelligence and understanding, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy." *Lopez v. United Auto. Ins. Co.,* 274 P.3d 897, 902 (Utah 2012) (internal quotation marks and ellipses omitted). But because "an insurance policy is a classic example of an adhesion contract," Utah courts have long held that "insurance policies should be construed liberally in favor of the insured and their

---

[9] In cases arising under diversity jurisdiction, the court is bound by the decisions of the forum state's highest court. In the absence of such binding authority, the court must attempt to predict what the state's highest court would do by seeking guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and "the general weight and trend of authority" in the relevant area of law. *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

beneficiaries so as to promote and not defeat the purposes of insurance." *U.S. Fid. & Guar. Co. v. Sandt,* 854 P.2d 519, 521–22 (Utah 1993) (internal quotation marks omitted). "It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage" and "provisions that limit or exclude coverage should be strictly construed against the insurer." *Id.* at 522–23. Accordingly, "once the insured has established the right of coverage under the insuring clause and liability coverage is triggered, the insurer has the burden to demonstrate that exclusions exist under which it can deny coverage." *Am. Nat. Prop. & Cas. Co. v. Sorensen*, 362 P.3d 909, 913 (Utah Ct. App. 2013). The court strictly construes any exclusions, giving them effect "only when they use language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Id.* at 916 (internal quotation marks omitted).

Here, the Policy is a claims-made policy, which by its very nature provides coverage only for claims first made during the Policy Period. *See AOK Lands, Inc. v. Shand, Morahan & Co.*, 860 P.2d 924, 927 (Utah 1993). Specifically, the Policy provides that the "insurer shall pay on behalf of the insureds loss resulting from claims first made[10] against the insured during the Policy Period . . . for wrongful acts." (Dkt. No. 12-1, p. 20).[11] In turn, "wrongful acts" are "any actual or alleged act error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by any insured in the performance of, or failure to perform, professional services." (*Id.*).

---

[10] The parties agree that a claim is formally "made" for the purposes of the Policy when the insured receives notice that a third party has alleged wrongful acts against it. In a separate section, the Policy provides that claims can also be deemed to have been made during the Policy Period, if, prior to the Policy Period, the insured becomes aware of a wrongful act and discloses that there is a potential claim to the insurer before the formal claim has been made to the insured. In such a case, a subsequent claim (submitted to the insured) will be treated as made on the date the notice was given to the insurer. *See* (Dkt. No. 12-1, p. 16).

[11] Various terms that are defined by the Policy are bolded and capitalized in the Policy. For ease of reading, the court omits these stylistic emphases.

The Policy also contains a relate-back exclusion, which states that "[a]ll claims arising from interrelated wrongful acts shall be deemed to constitute a single claim and shall be deemed to have been made at the earliest time at which the earliest such claim is made or deemed to have been made." (*Id.*, p. 17). Claims that are deemed to have been made prior to the applicable Policy Period are excluded from coverage under the Policy.[12] Accordingly, the court must determine: 1) whether the SEC's pre-Policy Period investigation notices constitute a claim and if so, 2) whether both the SEC Claim and the Morden Claim arise from interrelated wrongful acts.

### 1. The SEC's pre-Policy correspondence constitutes a claim.

The Policy defines a claim as "(1) any written *notice received by an insured* that *any person or entity intends to hold any insured responsible for a wrongful act*; (2) any civil proceeding in a court of law or equity, or arbitration; *or* (3) any criminal proceeding which is commenced by the return of an indictment." (Dkt. No. 12-1, p. 14 (emphasis added)). Based on this language, it is apparent that a claim may be something less formal than the civil or criminal proceedings contemplated by subsections (2) and (3) because of the Policy's disjunctive inclusion of subsection (1). Likewise, nothing in the Policy requires that the wrongful act referenced in the notice be definitively proven. To the contrary, wrongful acts include mere allegations of wrongdoing. *Id.*; *see, e.g.*, *Nat'l Stock Exch. v. Fed. Ins. Co.*, No. 06-civ-1603, 2007 WL 1030293, at *5 (N.D. Ill. Mar. 30, 2007) (holding that where wrongful acts are defined to include acts "allegedly" committed, "the scope of the term necessarily includes acts that *may have been* committed").

---

[12] As explained, claims made after the Policy Period can, in some instances, be deemed to have been made during the Policy Period for the benefit of the insured so long as the insured provides the insurer with notice of a potential claim. *See, e.g.*, *AOK Lands, Inc. v. Shand, Morahan & Co.*, 860 P.2d 924, 926 (Utah 1993) ("The typical claims-made policy provides insurance coverage for acts or omissions occurring either before or during the term of the policy, provided the claim is discovered and reported during the same policy term."); *Burks v. XL Specialty Ins. Co.*, No. 14-14-00740-CV, 2015 WL 6949610, at *5 (Tex. App. Nov. 10, 2015) (explaining that interrelated-claims provisions can be a double-edged sword).

But it is also evident that notice to hold the insured responsible for a wrongful act must be more than "an accusation that wrongdoing occurred . . . a naked threat of a future lawsuit . . . or a request for information or an explanation." *Windham Solid Waste Mgmt. v. Nat'l Cas. Co.*, 146 F.3d 131, 134 (2d Cir. 1998); *see, e.g.*, *Office Depot, Inc. v. Nat'l Union Fire Ins. Co.*, 453 F. App'x 871, 876 (11th Cir. 2011) (unpublished opinion) (holding that letters from the SEC merely requesting that Office Depot preserve documents and provide testimony were not claims, but that a Wells Notice, which stated that a civil proceeding for injunctive relief may be commenced, was a claim). Accordingly, courts have limited the definition of a claim for the purposes of a relate-back defense to require allegations of wrongdoing coupled with a specific demand for relief. *See Windham*, 146 F.3d at 134.

For instance, in *Windham*, the Second Circuit held that several letters from the Vermont Agency of Natural Resources constituted a claim—which was defined as written or oral notice from any party that it is the intention of such party to hold the insured responsible for any wrongful acts—because those letters explained that the Windham Solid Waste Management District would be responsible for the environmental cleanup caused by the District's solid waste disposal practices. The Second Circuit reasoned that this correspondence was sufficient to constitute a claim because it definitively demanded specific relief in the form of environmental cleanup costs—although in an amount yet to be determined. *Id.* at 134–35.

Likewise, in *Fidelity National Property & Casualty Co. v. Boardwalk Condominium Association, Inc.*, No. 3:07-cv-278, 2010 WL 1911159 (N.D. Fla. May 12, 2010), the United States District Court for the Northern District of Florida considered whether various letters constituted claims in the context of a claim definition identical to the Policy at issue here. There, the plaintiff, Fidelity National Property & Casualty Company, provided notice to the defendant,

Boardwalk Condominium Association, that Fidelity intended to hold Boardwalk responsible for improperly reporting the status of buildings damaged by flooding, resulting in Boardwalk receiving insurance payments in excess of the amounts to which it was entitled. *Id.* at *5. As a result, Fidelity submitted several letters to Boardwalk "requesting" repayment of the specific sums it asserted were incorrectly paid. *Id.* Fidelity also expressly stated that if Boardwalk did not remit these sums, Fidelity would "take further action to make the recovery." *Id.* at *6. The court explained that the assertion of incorrectly paid sums, coupled with Fidelity's express statement that it would take further action if Boardwalk did not remit payment, "unmistakabl[y]" evidenced Fidelity's intent to hold Boardwalk responsible for the error. *Id.* at *5. Thus, the letters constituted a claim under the policy.

Guided by this persuasive authority, the court concludes that the SEC's pre-Policy Period notices of its investigation constitute a claim as that term is defined in the Policy. In February 2009, prior to the Policy Period, SEC staff sent Belsen Getty a Wells Notice informing Belsen Getty that it "intended to recommend that the Commission bring a civil injunctive action" against Belsen Getty, alleging that Belsen Getty violated various securities laws. (Dkt. No. 55-1, p. 39). Also prior to the Policy Period, on August 28, 2009, SEC staff sent a letter to Belsen Getty indicating that the SEC had conducted an examination and had "identified" various "deficiencies and weaknesses," including allegations that Belsen Getty and related persons manipulated the market for Nine Mile, and "may have orchestrated a scheme of executing discretionary trades in Belsen Getty accounts in order to create a false appearance of active trading and raise the price" of Nine Mile stock. (Dkt. No. 55-1, p. 211–14). The letter stated further that it "appears Belsen Getty and related persons may have failed to provide certain material disclosures to clients," and that Belsen Getty "appears to have breached its fiduciary duty to clients" by failing to inform

investors of its conflicts of interest related to Nine Mile. (*Id.*, p. 213–14). The letter also alleged various failures to comply with the Advisers Act. The letter concluded that SEC staff brought these deficiencies and weaknesses to Belsen Getty's attention "for immediate corrective action." (*Id.*, p. 217). It further requested that Belsen Getty respond in writing "describing the steps [it had] taken or intend[s] to take with respect to each of these matters." (*Id.*).

In addition, on September 24, 2009, also prior to the Policy Period, the SEC issued an order directing an investigation for the wrongful acts the SEC had identified in its prior correspondence. In this order, the SEC stated that it had information that "tends to show" Belsen Getty "may have been or may be employing devices, schemes, or artifices to defraud, obtaining money or property by means of untrue statements of material fact or omitting material facts," in relation to Belsen Getty's sale of Nine Mile stock. (Dkt. No. 25-4, pp. 2–4). It further authorized SEC officers to "administer oaths and affirmations, subpoena witnesses, compel their attendances, take evidence, and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other [relevant] records." (*Id.*, p. 4). Acting pursuant to this authority, SEC officers issued subpoenas to Mr. Limpert, Mr. Deru, and Mr. Deru's son, compelling them to testify before the SEC and produce various documents. The subpoenas stated that failure to comply "may subject you to fine and/or imprisonment." (Dkt. Nos. 32-1, pp. 227, 234; 32-2, p. 257).

When taken together, this correspondence provided notice to Belsen Getty that the SEC intended to hold it responsible for wrongful acts, including its breaches of fiduciary duties to investors. Rather than be mere accusations of wrongdoing, naked threats of a future lawsuit, or simple requests for information or explanation, the SEC correspondence plainly evidences the SEC and its staff's intent to seek specific relief from Belsen Getty by recommending that the

SEC bring a civil injunctive action, demanding "immediate corrective action," and compelling, through subpoena, testimony and production of documents. *See, e.g.*, *Polychron v. Crum & Forster Ins. Co.*, 916 F.2d 461, 463 (8th Cir. 1990) (holding that the definition of claim encompassed a subpoena to appear before a grand-jury because, although issued to a third-party bank, the documents demanded were related to the plaintiff's conduct as a bank official, and the investigation and questioning at the grand jury proceeding amounted to an allegation of wrongdoing); *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, No. 03 C 6067, 2004 WL 603482, at *7 (N.D. Ill. Mar. 22, 2004) (collecting cases and holding that SEC orders directing investigations and subpoenas that compelled testimony and production of documents constituted demands for specific relief such that they were a claim). The understanding that the SEC intended to seek specific relief from Belsen Getty is further confirmed by the undisputed fact that, prior to the Policy Period, counsel for Belsen Getty attempted to negotiate a settlement with the SEC "in an effort to resolve the Staff's concerns about their conduct." (Dkt No. 32-2, p. 91–92). This offer to settle illustrates that even Belsen Getty was aware that the SEC intended to hold it responsible for the alleged wrongful acts. *See Polychron*, 916 F.2d at 463 (finding it relevant that the insured "prudently hired an attorney" to represent him during grand jury proceedings, and therefore "[t]he defendants' characterization of the grand-jury investigation as mere requests for information and an explanation underestimates the seriousness of such a probe"); *Minuteman Int'l*, 2004 WL 603482, at *7 ("[A]n SEC subpoena is not a mere request for information, but a substantial demand for compliance by a federal agency with the ability to enforce its demand."). On these facts, XL correctly determined that the SEC's pre-Policy Period notices constitute a claim under the Policy.

### 2. Interrelated Wrongful Acts

Having determined that the SEC's pre-Policy Period notices constitute a claim (hereinafter the SEC Claim), the court now considers whether the Morden Claim should be excluded from coverage because it relates back to the SEC Claim. This requires the court determine if the both the SEC Claim and the Morden Claim arise from interrelated wrongful acts such that they should be considered a single claim deemed to have been made on the date of the SEC Claim. (Dkt. No. 12-1, p. 16–17).

The Policy defines interrelated wrongful acts as wrongful acts that "are based on, arising out of, directly or indirectly resulting from, in consequence of, *or in any way involving* any of the same or related or series of *related facts*, circumstances, situations transactions or events." (emphasis added). (*Id.*, p. 14). By its plain terms, the definition of interrelated wrongful acts is broad. But it is not ambiguous. *See Daines v. Vincent*, 190 P.3d 1269, 1275 (Utah 2008) (a contractual provision is ambiguous "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies" (internal quotation marks omitted)); *see, e.g.*, *XL Specialty Ins. Co. v. Perry*, No. CV 11-02078-RGK, 2012 WL 3095331 (C.D. Cal. June 27, 2012) (rejecting the argument that an identical provision is ambiguous simply because it is broad); *see also, e.g.*, *Templeton v. Catlin Specialty Ins. Co.*, 612 F. App'x 940, 957 (10th Cir. 2015) (concluding that the word "similar" as used to define interrelated wrongful acts was not ambiguous, despite its breadth); *cf. Stauth v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 97–6437, 1999 WL 420401, at *7–8 (10th Cir. 1999) (interpreting an interrelated wrongful acts provision narrowly where the phrase was not defined in the policy) (unpublished table opinion). Rather than be capable of multiple meanings, the Policy plainly and unmistakably communicates to an insured that wrongful acts are interrelated where they are

logically or causally connected. *See Berry & Murphy*, 586 F.3d at 813 ("[T]he common understanding of the word 'related' covers a very broad range of connections, both causal and logical." (quoting *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989)); *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1263 (11th Cir. 2000) (per curiam) ("The plain meaning of the word 'relate' is to show or establish a logical or causal connection between." (internal quotation marks omitted)); *Related*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "related" as "[c]onnected in some way; having relationship to or with something else"). Indeed, the Mordens do not offer any alternative interpretation for which the phrase could be capable of being reasonably understood. *See Daines*, 190 P.3d at 1275 (Utah 2008) (a contractual provision is ambiguous if it is capable of more than one reasonable interpretation).

Because of its breadth, the interrelated wrongful acts provision does not require the wrongful acts alleged in the claims to be identical to be interrelated. *See Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983, 990 (8th Cir. 2014) (cautioning that "micro-distinguishing" between facts in determining whether claims are sufficiently connected would "subvert[ ] the purpose of the phrase series of related acts" (internal quotation marks omitted)); *see, e.g.*, *Wendt*, 205 F.3d at 1264 ("The fact that these acts resulted in a number of different harms to different persons, who may have different types of causes of action . . . does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract [where they] comprised a single course of conduct designed to promote investment in [the firm]."). Not every wrongful act that shares some common facts, however, is necessarily interrelated. As explained, the wrongful acts must be at least logically or causally connected. *See Berry & Murphy*, 586 F.3d at 811–812 (defining "logically connected" as "connected by an inevitable or predictable interrelation or sequence of events," and "causally connected" as "where one person or thing brings about the

other" (internal quotation marks omitted); *Logical*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, p. 1130 (2d ed.) (defining "logical" as "reasonable; to be expected");[13] *see, e.g.*, *Berry & Murphy*, 586 F.3d at 803 (holding that a letter alleging malpractice alleged wrongful acts interrelated with the client's ultimate malpractice suit because there was a single client, who alleged misconduct against a single attorney, related to a single tort claim, and the conduct resulted in a single harm); *Kilcher*, 747 F.3d at 989 ("[A] court may consider several factors in concluding whether dishonest acts are part of a series of related acts, including whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi.") (internal quotation marks omitted).

But even if multiple claims allege interrelated wrongful acts, the court's inquiry is not at an end. Rather, the Policy requires that for multiple claims to be treated as a single claim under the relate-back provision, the claims must "*aris[e] from*" those interrelated wrongful acts. (Dkt. No. 12-1, p. 17 (emphasis added). The Policy does not define the phrase arise from. Nevertheless, the court finds the phrase is also unambiguous. Black's Law Dictionary defines "arise from" as "to originate; to stem (from)," or "to result (from)." *Arise from*, BLACK'S LAW DICTIONARY (10th ed. 2014). This definition mirrors the common dictionary definition of the phrase. *See, e.g.*, *Arise from*, THE RANDOM HOUSE DICTIONARY, p. 113 (defining "arise from" as "to result or proceed, spring or issue"). Thus, multiple claims alleging interrelated wrongful acts can be treated as a single claim only where they are both the result of those alleged interrelated wrongful acts. Accordingly, by the Policy's plain terms, the correct analytical framework for evaluating whether the Morden and SEC Claims should be treated as a single claim under the Policy is for the court to begin by identifying the interrelated wrongful acts presented in both

---

[13] In interpreting a contract, the court can determine the ordinary and usual meaning of the words through using standard, non-legal dictionaries. *S. Ridge Homeowners' Ass'n v. Brown*, 226 P.3d 758, 759 (Utah Ct. App. 2010).

claims. Next, the court must next assess whether both the SEC and Morden Claims are the result of those interrelated wrongful acts.

    *a.*  *The SEC and Morden Claims allege both interrelated and unrelated wrongful acts.*

The court begins by recognizing that the Morden and SEC Claims likely allege interrelated wrongful acts related to Belsen Getty's conduct regarding Nine Mile, Axxess, and ProFire. Indeed, the Morden Claim expressly references the omissions related to Nine Mile, one of the subjects of the SEC pre-Policy Period notices. Likewise, both the SEC and Morden Claims allege similar breaches of fiduciary duty with respect to Nine Mile, Axxess, and ProFire: that Belsen Getty breached its fiduciary duties by recommending high-risk, speculative, and illiquid investments to Belsen Getty clients, even though the investments did not match the clients' investment objectives. With respect to these three investments, Mr. Deru completed purchases of stock in Axxess, Nine Mile, and ProFire for clients using Belsen Getty's discretionary authority and did not disclose material conflicts of interest, namely that Belsen Getty principals and/or family members had a financial interest in these companies. (*See* Dkt. Nos. 55-1, pp. 212–14; 32-4, pp. 46; 52-2, p. 146). Thus, the wrongful acts alleged regarding these three stocks are at least arguably logically connected such that they may be considered interrelated wrongful acts.

But significant portions of the SEC and Morden Claims do not allege interrelated wrongful acts, even under that phrase's broad definition. In addition to alleging that Belsen Getty breached its fiduciary duties related to Nine Mile, Axxess, and ProFire, the SEC appears to have been equally concerned by Belsen Getty's "scheme of executing discretionary trades in Belsen Getty accounts in order to create a false appearance of active trading and raise the price" of Nine Mile stock. (*See* Dkt. No. 55-1 pp. 212–13, 224). Nothing indicates that this independent wrongful act of market manipulation is logically or causally connected to Belsen Getty's conflict

of interest. The fact that it involves the same stock is not sufficient, particularly where the method and modus operandi of the wrongful acts differ. *See Kilcher*, 747 F.3d at 989. The SEC was also apparently troubled by Belsen Getty's general failures to comply with the Advisers Act, including, for instance, its failure to have a written solicitor's agreement. (Dkt. No. 55-1, p. 215). But as with the market manipulation allegation, there is no logical or causal connection between the failures to comply with the Advisers Act and the failure to disclose conflicts of interest in Nine Mile, Axxess, and ProFire.

Likewise, the undisputed facts reveal that Belsen Getty's conduct related to Nine Mile, Access, and ProFire is substantially dissimilar from the wrongful acts related to Vermillion and the gold mine. For instance, Mr. Deru's method of securing the Mordens' investment in the gold mine was materially different from his conduct related to Nine Mile or any other stock. Indeed, whereas Mr. Deru used Belsen Getty's discretionary authority to invest in Nine Mile, Axxess, and ProFire on behalf of Mr. and Ms. Morden, he personally solicited the Mordens' investment in the gold mine. Moreover, the misrepresentations are different. Rather than fail to disclose a conflict of interest, Mr. Deru affirmatively misrepresented to the Mordens that the mine was operational, had the necessary permits, and was owned by Vermillion. He also continued to make misrepresentations about the mine's status after the Mordens' initial investment and encouraged the Mordens to become more active in the mine in order to salvage the project. This resulted in additional damages beyond the initial investment.

Furthermore, the Mordens' investment in the gold mine was different in kind from the other investments. Unlike the purchase of shares of stock in Nine Mile, Axxess, or ProFire, the investment in the gold mine was in the form of a real estate loan secured by water rights in Southern Utah. There is no evidence that Mr. Deru solicited similar investments in real estate

loans from other investors, or that this method of solicitation was the result of, or motivated by, Belsen Getty's misconduct related to Nine Mile or any other stock. Likewise, although Mr. Deru, Mr. Deru's son, and/or Mr. Limpert were all involved in Nine Mile, Axxess, and ProFire, there is nothing to suggest that any other Belsen Getty associate had any involvement with the gold mine investment, or that any other Belsen Getty associate recommended or solicited investments in the form of real estate loans. In sum, although both the SEC and Morden Claims arguably assert interrelated wrongful acts with respect to Nine Mile, Axxess, and ProFire, they also make allegations of other wrongful acts that are not logically or causally connected to these three investments.

      *b. The Morden and SEC Claims do not arise from the interrelated wrongful acts.*

      The court must now determine if the Morden and SEC Claims arise from interrelated wrongful acts, where, in addition to alleging wrongful acts associated with Nine Mile, Axxess, and ProFire, both claims allege significant wrongful acts unrelated to those investments. Courts considering this question have recognized for claims to arise from interrelated wrongful acts, they must share a "sufficient factual nexus." *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238 (10th Cir. 2013) (applying New York law). That is, they must be the product of a common plan, a common scheme, a single course of conduct, or single injury. *See Liberty Ins. Underwriters*, 2016 WL 741837, at *8 (explaining that claims may be related even if they "allege different types of causes of action and arise from different acts" where there is "a single course of conduct that serves as the basis for the various causes of action" or a "single course of conduct aimed at a single particular goal"); *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 CIV. 10088 (PKL), 2004 WL 1145830, at *6 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005) ("Claims share a sufficient factual nexus when they are

based on the same agreement or when they involve the same underlying circumstance." (internal

quotation marks omitted)); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855

P.2d 1263 (Cal. 4th 1993) (holding that two claims arose from interrelated wrongful acts where

they arose out of the same transaction, related to the same client, were committed by the same

attorney, and resulted in a single injury). The court cannot treat multiple claims as a single claim

if they are so factually and legally distinct that the relationship between the two is "so attenuated

or unusual that an objectively reasonable insured could not have expected that they would be

treated as a single claim under the policy." *See Axis Surplus Ins. Co. v. Johnson*, No. 06-CV-500-

GKF-PJC, 2008 WL 4525409, at *8 (N.D. Okla. Oct. 3, 2008); *Liberty Ins. Underwriters*, ___ F.

Supp. 3d ___, 2016 WL 741837, at *6 (C.D. Cal. Feb. 23, 2016) ("At some point, a relationship

between two claims, though perhaps 'logical,' might be so attenuated or unusual that an

objectively reasonable insured could not have expected they would be treated as a single claim

under the policy." (internal quotation marks omitted)); *see, e.g.*, *Seneca Ins. Co.*, 2004 WL

1145830, at *6 ("[C]laims do not share a sufficient factual nexus when a claim arising under one

policy describes wrongs that are factually and legally distinct from wrongs described in a claim

arising under a prior policy." (internal quotation marks omitted)).

  For example, in *Brecek & Young Advisors*, the Tenth Circuit held that three arbitration

proceedings arose from interrelated wrongful acts, even where there was some difference in the

claims and parties, because all three proceedings shared a "sufficient factual nexus." 715 F.3d at

1238. For instance, the three proceedings involved largely the same respondents, there were

allegations of similar misconduct that occurred during the same period, and all of the claims

alleged that the insured was vicariously liable for failing to supervise its broker/agents, to the

detriment of investors. *Id.* at 1238. Further, and most importantly, all claims involved allegations

of churning or flipping of investment accounts in order to enrich the broker/agents at the expense of account holders. *Id.* at 1238. Thus, the Court held that the three proceedings were sufficiently connected by common facts, circumstances, decisions, and policies that they could be considered to arise from interrelated wrongful acts. *Id.* at 1239.

In contrast, in *Financial Management Advisors, LLC v. American International Specialty Lines Insurance Co.*, the Ninth Circuit held that two claims did not arise out of the "same or related wrongful acts" where different investors brought fraudulent misrepresentation claims against the same investment advisory firm. 506 F.3d 922, 925–26 (9th Cir. 2007). The court reasoned that despite the fact that both claims shared allegations related to a common investment vehicle, they were brought by "unrelated investors, with unique investment objectives [who] were advised at separate meetings on separate dates, according to their unique financial positions." *Id.* at 925. Moreover, the plaintiffs had ultimately been presented with, and invested in, different funds, and "[m]ore importantly, some of the [w]rongful [a]cts alleged by the two clients were different." *Id.* Indeed, one plaintiff's claims were based primarily on "various omissions and oral misrepresentations made in connection with many different investment vehicles," while another's "relie[d] heavily on affirmative misrepresentations in written materials" and "breach of a written agreement." *Id.* at 926. Thus, the court declined to find claims interrelated "whenever two parties are advised to invest in the same fund" or "both claimants blame the same financial advisor." *Id.*

Here, XL argues that that the SEC and Morden Claims should be treated as a single claim because both allege that Belsen Getty breached its fiduciary duties by making untrue statements of material fact and omitting material facts with respect to all investments. The court disagrees. Attempting to characterize the claims as a single claim simply because they may involve similar

legal theories paints with too broad a brush. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Chong*, 787 F. Supp. 183, 188 (D. Kan. 1992) (finding that three malpractice claims arising from an attorney's multiple representation of three clients in a criminal trial were unrelated because the attorney owed a separate duty to each client); *Scott v. American Nat. Fire Ins. Co., Inc.*, 216 F. Supp. 2d 689, 694 (N.D. Ohio 2002) (holding that malpractice claims against an attorney by three separate clients were not related, even though they arose from the attorney's representation of all three in the formation of a company, because the attorney owed separate duties to each, and the alleged breach of those duties gave rise to distinct harms). Instead, the court must look at the factual allegations underlying each claim to assess if they involve a sufficient factual nexus. *Seneca Ins. Co.*, 2004 WL 1145830, at *7 ("The concept of 'claim' is distinct from that of 'suit,' and neither the initial amalgamation of claims in one suit nor the variety of procedural metamorphoses which a suit often undergoes alters the distinctive nature of individual claims or the consequent loss potentially incurred therefrom. Instead, the court evaluates an exclusion based on the underlying facts rather than the legal theories pleaded or additional defendants named." (internal citations, quotation marks, brackets, and ellipses omitted); *see, e.g.*, *Axis Surplus*, 2008 WL 4525409, at *9 (rejecting the argument that two claims should be treated as one claim for the purposes of the policy, despite the fact that both alleged of breaches of fiduciary duty and gross negligence, where the factual basis underlying each legal claim was different).[14] Engaging in that inquiry here, the court concludes that the facts underlying each claim do not share a sufficient factual nexus to be considered a single claim.

As explained, although both the Morden and SEC Claims contain allegations that Belsen Getty breached its fiduciary duties, the breaches of fiduciary duties with respect to the

---

[14] For this reason, the court is unpersuaded that it must consider both claims to arise from the same wrongful acts simply because the Morden Claim imprecisely lumps the conduct with respect to each investment together.

interrelated wrongful acts and unrelated wrongful acts are very different. For instance, there is nothing to indicate that Mr. Deru's actions related to the gold mine—which form a significant portion of the Morden Claim—and the investments in Axxess, Nine Mile, and ProFire were the product of a common plan, common scheme, or single course of conduct. *Cf. Liberty Ins. Underwriters*, 2016 WL 741837, at *8 (holding that multiple claims could be treated as one claim where "they all *arise from* a *single course of conduct*, a unified policy of making alleged affirmative misrepresentations to investors in order to induce them to invest in commercial real estate acquisitions" (internal quotation marks omitted) (emphasis added)). Nor is there any evidence to suggest that the Morden or SEC Claim arose from the same injury or that they were the direct result of each other. *Cf. Perry*, 2012 WL 3095331, at *8 (holding that an SEC enforcement action for allegedly false representations regarding IndyMac's financial status was interrelated to a class action alleging that IndyMac ignored its own underwriting standards when originating loans because, although the alleged wrongs were different, the SEC action was the "direct[] result[]" of the wrongful acts alleged in the class action lawsuit; specifically, the risky mortgages put IndyMac in a perilous financial condition, one which the defendants allegedly tried to cover up through false SEC filings). As explained, the wrongful conduct related to Axxess, ProFire, and Nine Mile differed significantly from the conduct related to the gold mine. And the resulting injuries to the Mordens as a result of the different breaches of fiduciary duties were different. There is no evidence to show the Mordens would have filed a lawsuit just on the basis of the misconduct related to Nine Mile, Axxess, or ProFire alone.

Not only is the conduct alleged in each claim materially different, the claims also differ in other significant ways. For example, the claimants are different. In one claim, the claimant is the SEC, a governmental agency. In the other claim, the plaintiffs are the Mordens, a family of

private investors. To the extent the SEC acted on behalf of Belsen Getty's investors, that group

included many investors besides the Mordens and did not include Wade Morden. Thus, any

factual nexus between the claims is marginal at best. *Cf. Brecek & Young Advisors*, 715 F.3d at

1238–39. Rather, as in *Financial Management Advisors*, 506 F.3d at 925–26, it appears that

Belsen Getty was generally dysfunctional during the relevant time period, and, through its

members, was involved in a wide range of misconduct that injured many investors, including the

Mordens. This resulted in two different claims that may share some factual and legal overlap

related to Nine Mile, Axxess, and ProFire. But the SEC and Morden Claims also differ

significantly in that each alleges factually different harms, to different individuals, through very

different methods and means. Thus, the court cannot conclude that it would have been

foreseeable to a reasonable insured that the SEC's investigation into Belsen Getty's conduct

related to Nine Mile, Axxess, and ProFire would be treated as the same claim as the wrongful

conduct related to the gold mine. The court declines to reach that conclusion simply because the

claims involve misconduct by the same investment advisor. For this reason, the SEC Claim and

Morden Claim do not arise from interrelated wrongful acts and XL erred when it denied the

Morden Claim on this basis. The Mordens are therefore entitled to partial summary judgment in

their favor on XL's counterclaim for declaratory judgment that both claims arise from

interrelated wrongful acts.

### B. The Mordens' Contractual Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing

Having decided that XL incorrectly concluded that the Morden Claim related back to the

SEC Claim, the court turns to XL's motion for summary judgment on the Mordens' claim for

breach of the implied covenant of good faith and fair dealing. *See Chapman Constr., LC v.*

*Cincinnati Ins. Co.*, No. 2:15-CV-00172-DB, 2015 WL 8042071, at *3 (D. Utah Dec. 4, 2015)

24

(holding that even where the court disagreed with the insurance company's interpretation of a policy, "the Court's disagreement with [the insurer] does not amount to [the insurer] acting in bad faith").

In the context of an insurance contract, the Utah Supreme Court has explained that the "implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Jones v. Farmers Ins. Exch.*, 286 P.3d 301, 304 (Utah 2012). But "an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied." *Id.* (internal quotation marks omitted).[15] Considering the undisputed facts presented here, the court finds that XL's claim denial was fairly debatable. Accordingly, XL is entitled to summary judgment in its favor on this claim. *See Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996) ("Whether an insured's claim is fairly debatable under a given set of facts is . . . a question of law."); *Pheasantbrook Home Owners Ass'n v. The Travelers Indem. Co.*, No. 1:14-CV-00056-DN, 2016 WL 309771, at *16 (D. Utah Jan. 25, 2016) ("Not all cases involving the 'fairly debatable' defense can be resolved as a matter of law, but whether an insured's claim is fairly debatable under a given set of facts is a question of law.").

---

[15] The Mordens dispute that the fairly debatable standard applies to its claims for breach of the implied covenant of good faith and fair dealing. According to the Mordens, XL had an obligation not to deny the claim unless there was "clear, unequivocal, and uncontroverted evidence" showing that the claim was not covered. (Dkt. No. 59, p. 5). This argument improperly relies on an obligation an insurer would owe to its insured if it had a duty to defend. *See Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1215 (Utah 2006) (explaining that if coverage is uncertain, an insurer must defend until any uncertainties can be resolved against coverage, because "[w]hen in doubt, defend" (internal quotation marks omitted)). As the court explains in greater detail, *see infra* Section C, XL had no obligation to defend Belsen Getty under the Policy. If the court were to adopt the Mordens' argument that an insurer—who has only a contractual duty to indemnify losses—cannot deny a claim unless the grounds for denial are certain, an insurer would never be able to rely on the fairly debatable defense. Accordingly, the court rejects the Mordens' attempt to avoid application of the fairly debatable standard as it relates to their contractual claim for breach of the implied covenant of good faith and fair dealing.

Notwithstanding the court's disagreement with XL's Policy interpretation, XL's determination that the Morden Claim was not covered under the Policy is fairly debatable as a matter of law. *See Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 535 (Utah 2002) ("A 'debatable reason,' for purposes of determining whether [an] insurer may be subjected to bad-faith liability, means an arguable reason, a reason that is open to dispute or question." (quoting 14 Lee R. Russ & Thomas F. Segalla, *Couch on Ins.* § 204:28 (3d ed. 1999)). In this case, XL's determination did not turn on disputed issues of fact, which may have created an issue for the fact finder, but in the legal import of facts that are not in dispute. *Cf. Jones*, 286 P.3d at 307 (denying motion for summary judgment as to whether a claim denial was fairly debatable where insurer denied coverage for dental work on the basis that the insured's teeth had not been cracked in an accident, but that fact was genuinely disputed). These undisputed facts establish that XL acted in good faith in investigating the claim and reaching its coverage decision.

Indeed, the undisputed facts show that XL consulted with Troutman Sanders, a firm retained to represent XL in this matter, who engaged in a robust analysis of the persuasive authority in this area. This authority provides support for XL's determination—with which this court agrees—that the SEC pre-Policy Period correspondence constituted a Claim and that the interrelated wrongful acts provision is unambiguously broad. Troutman Sanders also considered the allegations of the Morden Claim and the SEC Claim and reasoned that both claims arose from interrelated wrongful acts. (*See* Dkt. No. 32-4, pp. 86–91). Although the court concludes that Troutman Sanders erred in its analysis on this point, its contrary conclusion was reasonable. The law in this area is complex, nuanced, and fact-specific. In many instances, courts are tasked with interpreting policy language that is different from that presented here. And significantly, the Mordens fail to cite any controlling authority that would squarely resolve this issue in their favor.

*See Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 858 (10th Cir. 2015) (applying Wyoming law) ("[I]t is not necessarily an act of bad faith for an insurer to deny . . . payment of benefits where the underlying incident objectively may be seen as being covered by a policy exclusion, particularly where there is no controlling authority within the jurisdiction.").

Further, there is arguable support in the record for Troutman Sanders's assessment that the Morden Claim and SEC Claim arose from interrelated wrongful acts. As explained, the Morden Claim expressly references the investments in Nine Mile, the very subject of the SEC Claim. Both the SEC Claim and Morden Claim make similar allegations of wrongful acts with respect to Nine Mile, Axxess, and ProFire: that Belsen Getty breached its fiduciary duties by making improper investment recommendations, by acting under a conflict of interest, and by failing to disclose material facts to investors. This provides support for XL's coverage decision. *See Larsen v. Allstate Ins. Co.*, 857 P.2d 263, 266 (Utah Ct. App. 1993) (concluding that insurance company did not act in bad faith by failing to make payments under insurance policy, where it "did not arrive at its coverage determination arbitrarily," but instead sought the opinion of its legal counsel, there were cases from other jurisdictions that arguably supported its position, policy considerations weighed in favor of the interpretation, and the trial court agreed with the insurer's interpretation). Although the court is not persuaded that these similarities, when weighed against the significant differences between the two claims, provide a sufficient basis to conclude that both claims arise from interrelated wrongful acts, XL's contrary conclusion is not without basis in reason. In fact, the Mordens themselves imprecisely linked the various separate transactions and investments together in their claim. (*See* Dkt. No. 52-2, p. 146). Had the Mordens simply limited their allegations of wrongdoing to the Mexican gold mine investment, or drafted a complaint that more clearly identified the misconduct related to each investment, XL's

denial of coverage might have been more suspect.[16]

Furthermore, although the Mordens challenge the way XL investigated this case in reaching its coverage determination, they do not present any material evidence XL would have uncovered if it had investigated the case differently. Significantly, XL requested that Belsen Getty provide it with information and reviewed the documentation that Belsen Getty's counsel submitted to it. (Dkt. No. 32-4, p. 62). XL also invited Belsen Getty to submit any additional information for XL's consideration. (*Id.* p. 69). The Mordens do not identify any relevant materials that XL failed to consider, nor do they explain why XL was not entitled to make its coverage determination on the basis of the information Belsen Getty chose to disclose to it. *Cf. Jones*, 286 P.3d at 307 (denying motion for summary judgment where insured disregarded information that the insured had provided). The Mordens also fail to explain how any additional evidence would have changed the legal analysis.[17] *See Fort Lane Vill., L.L.C. v. Travelers Indem. Co. of Am.*, 805 F. Supp. 2d 1236, 1242 (D. Utah 2011) (granting insurer summary judgment on bad faith claim where its interpretation of the policy, although ultimately rejected by the court, was reasonable, the insurer acted responsibly by investigating the claim, and there was no evidence that the insurer undermined the insured's ability to recover under the policy). Thus, beyond disagreement with XL's coverage determination, the Mordens present no evidence from which a reasonable jury could conclude that XL's claim denial was not fairly debatable. As a

---

[16] The court notes that the Mordens' third-party complaint in the *Tabakh* action appears to be limited to allegations regarding the gold mine. (Dkt. No. 55-3, pp. 87–105). The Mordens have not alleged that they are entitled to coverage for the *Tabakh* claim or that XL's handling of that claim was improper. (Dkt. No. 2). Accordingly, the court expresses no opinion as to whether the *Tabakh* claim and SEC Claim arise from interrelated wrongful acts.

[17] At oral argument, counsel for the Mordens conceded that the only additional fact that XL's investigation would have revealed if it had investigated the claim further was that Wade Morden had not invested in Nine Mile, Axxess, or ProFire. (Dkt. No. 74, p. 56–58). But this difference does not necessarily preclude the Morden Claim and SEC Claim from arising from interrelated wrongful acts. It would be only one factor to be considered in assessing if the wrongful acts were interrelated, and if the claims arose from those interrelated wrongful acts. *See Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238–39 (10th Cir. 2013) (holding claims were interrelated despite the existence of different plaintiffs).

result, XL is entitled to summary judgment on the Mordens' first cause of action for breach of the implied covenant of good faith and fair dealing.

### C.  The Mordens' Tort Claim for Bad Faith Breach of Fiduciary Duty

The court turns finally to the Mordens' claim that XL tortiously breached its fiduciary duty to Belsen Getty to settle the Morden Claim because there was a "substantial likelihood" that the Morden Claim would result in a judgment against Belsen Getty in excess of policy limits. *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 138 (Utah Ct. App. 1992) (holding that where an insurer has undertaken the task of representing its insured, it is obligated to accept an offer of settlement within policy limits when there is a substantial likelihood of a judgment being rendered against the insured in excess of those limits). This claim fails because XL owed no fiduciary obligations to Belsen Getty under the plain terms of the Policy.

In the seminal case of *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985), the Utah Supreme Court held that an insurer's decision to deny a claim does not, in every case, give rise to a cause of action in tort. Only where an insurer acts as a fiduciary can a plaintiff bring a tort claim for bad faith breach of fiduciary duty. *Id.* at 800. The Utah Supreme Court has clarified that an insurer bears such fiduciary responsibilities only where it "controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf." *Black v. Allstate Ins. Co.*, 100 P.3d 1163, 1169 (Utah 2004). In such a circumstance, an insurer bears heightened obligations because the insured is "wholly dependent upon the insurer to see that, in dealing with claims by third parties, the insured's best interests are protected." *Id.* at 1170. Where there is no such dependency, no corresponding fiduciary duties arise. *See id.*; *see also Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982) ("A fiduciary or confidential relationship may be created by contract or by circumstances where equity will imply

a higher duty in a relationship *because the trusting party has been induced to relax the care and vigilance he would ordinarily exercise*. In such a case, the evidence must demonstrate the placement of *trust and reliance* such that the nature of the relationship is clear." (emphasis added)). Considering the Policy and facts presented here, the court has little difficulty concluding that XL did not owe Belsen Getty any fiduciary duties.

The court begins by identifying XL's obligations under the Policy. *See Fire Ins. Exch. v. Estate of Therkelsen*, 27 P.3d 555, 559–60 (Utah 2001) (holding that the duty to indemnify and the duty to defend both arise solely under the insurance contract). Importantly, the Policy does not impose on XL the duty to defend. (Dkt. No. 12-1, p. 15 ("It shall be the duty of the insureds to defend any claim under this Policy.")). To the contrary, XL merely promised to indemnify Belsen Getty for certain covered losses, which include defense expenses, judgments, and settlement amounts. (Dkt. No. 32-1, p. 14). Because of XL's obligation to pay these expenses, it sought to retain some control over the way Belsen Getty defended or settled the case. Accordingly, the Policy provides that for Belsen Getty to be entitled to indemnification for these losses, Belsen Getty must obtain XL's approval before it may incur defense expenses or agree to a settlement that will exceed a certain amount. But in such a circumstance, Belsen Getty's approval shall not be unreasonably withheld. (Dkt. No. 32-1, p. 16).[18] These types of arrangements are not uncommon, *see* Restatement of the Law of Liability Insurance § 22 DD (2015) (discussion draft) (explaining that "[a] defense-cost-indemnification policy is an insurance policy in which the insurer agrees to pay the costs of defense of a covered claim and

---

[18] The Mordens do not allege, nor do they argue, that XL breached its obligations under the Policy by failing to pay requested defense expenses. To the contrary, their allegations of bad faith breach of fiduciary duty are limited to XL's failure to accept a settlement offer. Accordingly, the court does not consider if and when insurer has the obligation to tender defense expenses. *But see XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 288 (S.D.N.Y. 2012) (collecting cases and explaining that "many cases hold, or state, that advancement [of defense costs] is required only when a claim is covered. . . . Mandating advancement while even dubious assertions of coverage are resolved would invite abuse.").

does not undertake the duty to defend. Typically such policies also cover settlements and judgments."), and do not impose on the insured the type of fiduciary obligations that arise where the insurer has undertaken the obligation to defend the insured. *See* Kenneth F. Oettle, *D And O Insurance: Judicially Transforming A "Duty to Pay" Policy into A "Duty to Defend" Policy*, 22 Tort & Ins. L.J. 337, 342–43 (1987) ("Under prevalent forms of liability insurance policies, which are known generally as 'duty to defend' policies, the insurer selects defense counsel, orchestrates the defense, and pays for defense counsel's fees and disbursements as they are incurred. . . . Under a 'duty to pay' policy, on the other hand, . . . the insured controls the defense and/or settlement of the underlying action, retaining the counsel of its choice and deciding how the litigation should be conducted. Although the carrier must be consulted regarding the insured's choice of counsel or the terms of a proposed settlement, the carrier's consent may not be unreasonably withheld. For practical purposes, the insurer is relegated to the sidelines of the litigation, having a 'duty to pay' but not a right—and therefore not a duty—to defend."); *see also Therkelsen*, 27 P.3d at 561 ("[T]he duty to indemnify is not necessarily coextensive with the duty to defend. Indeed, generally, an insurer's duty to defend is broader than its duty to indemnify." (internal quotation marks omitted)).[19]

---

[19] The court's independent research has revealed one case that could support the argument that a duty to pay defense costs carries with it a duty to defend the case. *See Okada v. MGIC Indem. Corp.*, 795 F.2d 1450, 1454 (9th Cir.) *superseded on other grounds*, 823 F.2d 276 (9th Cir. 1986). The court declines to follow the reasoning of the majority in *Okada* for two reasons. First, unlike the Policy here, the policy in *Okada* was silent with respect to the duty to defend. Thus, because the Policy at issue here expressly disclaims any obligation to defend, the court cannot interpret the promise to indemnify Belsen Getty for defense expenses as creating a duty to defend. Second, the *Okada* decision appears to be in conflict with Utah law and the weight of authority from other jurisdictions, which hold that a duty to defend arises out of the terms of the policy. *See Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 266 P.3d 733, 735 (Utah 2011) (recognizing that an insurer's "duty to defend arises solely under the terms of the contract." (internal quotation marks and brackets omitted)); *Okada*, 795 F.2d at 1458–59 (Hall, J., dissenting) (criticizing the majority's interpretation of the policy and explaining that "[b]y defining litigation expenses as a loss they are subject to the exclusions set forth elsewhere in the policy the same as any other loss. The policy does not contemplate 'unconditional payment of defense costs for potentially covered claims' as the majority suggests, it contemplates payment of defense costs as a loss if indemnification is required. Conspicuously absent from the . . . policy is any clause providing that the insurer has the right and the duty to defend."); *accord In re Ambassador Grp., Inc. Litig.*, 738 F. Supp. 57, 61 (E.D.N.Y. 1990) (explaining that the *Okada* majority's result

Thus, the Policy's plain terms belie the argument that XL was authorized to "control[] the disposition of claims against its insured" such that Belsen Getty "relinquish[ed] any right to negotiate on [its] own behalf." *See Black*, 100 P.3d 1163 at 1170. Nor do the Mordens present any evidence to suggest that XL exerted this type of control. It is undisputed that XL did not appoint counsel to act on behalf of Belsen Getty, participate in or guide the defense, or otherwise take any action on Belsen Getty's behalf. To the contrary, Belsen Getty at all times retained its own counsel. Further, although XL could have participated in settlement negotiations without necessarily incurring fiduciary duties, *see id.* (recognizing that even if an insurance company participates in negotiations, no fiduciary duties arise until the insured has "relinquished any right to negotiate on his own behalf"), there is no evidence XL participated in any such negotiations. Notably, the Mordens forwarded their offer for Policy Limits to Belsen Getty's counsel, who then submitted the offer to XL. (Dkt. No. 55-4, pp. 93–94). For these reasons, XL did not owe Belsen Getty fiduciary obligations, nor did it accept heighted responsibilities to act as Belsen Getty's fiduciary.[20] The Mordens' claim that XL breached its fiduciary duties to settle the Morden Claim therefore fails as matter of law and XL is entitled to summary judgment on the Mordens' second cause of action for bad faith breach of fiduciary duties.[21]

conflicts with the consensus that policies containing similar duty to pay defense cost clauses are not duty to defend policies).

[20] The Mordens argue that XL bore heightened fiduciary duties because the Mordens are third parties who filed a suit against Belsen Getty. The court rejects this argument. Although the Utah Supreme Court has discussed fiduciary and contractual obligations in the third-party versus first-party context, it has made clear that fiduciary obligations do not automatically arise simply because the insured is subject to a third-party claim. *See, e.g.*, *Black v. Allstate Ins. Co.*, 2004 UT 66, ¶ 20, 100 P.3d 1163, 1168 (holding that there was no fiduciary duty, even under a third party policy, because fiduciary obligations inhere only when an insured relinquishes the ability to defend himself). Thus, the characterization of the claim as first party or third party is not dispositive. Moreover, where the Policy disclaims a duty to defend against third party claims and the Mordens are pursuing their complaint against XL as an assignee's of Belsen Getty's rights, it is not clear the claim is a third party claim rather than a first party claim.

[21] In resolving both of the Mordens' bad faith claims, the court has considered, over the objection of XL, the report of the Mordens' expert, L. Rich Humpherys. The court need not resolve the merits of XL's objections to

## CONCLUSION

In sum, the Morden Claim and the SEC Claim do not arise out of interrelated wrongful acts. Thus, this Policy exclusion cannot serve as a basis to deny coverage. Nevertheless, XL did not breach its contractual obligations to act in good faith by denying the Morden Claim because the claim's validity was fairly debatable. Further, XL had no obligation, nor did it undertake the duty, to defend Belsen Getty. Therefore, it had no corresponding fiduciary duties to settle the Morden Claim or otherwise act as Belsen Getty's advocate. Accordingly, the court **GRANTS** XL's motion for summary judgment (Dkt. No. 53), **GRANTS** in part and **DENIES** in part the Mordens' motion for partial summary judgment on XL's counterclaim (Dkt. No. 25), and **DENIES** as moot the remaining motions (Dkt. Nos. 30, 33, 46, 50). This ruling resolves the Morden complaint in its entirety. The only issue remaining is XL's counterclaim for declaratory judgment that it had no obligation to pay the Morden Claim because of Exclusion J, which excludes coverage for losses relating to Belsen Getty's rendering of investment banking services. (Dkt. No. 12, p. 21). The court will entertain further briefing on this counterclaim, should the parties wish to pursue it.[22]

SO ORDERED this 5th day of April, 2016.

---

Mr. Humpherys's report because it does not change the court's conclusion. Specifically, Mr. Humpherys's report does not create issues of fact as to whether XL discharged its obligations to act in good faith. Rather, Mr. Humpherys improperly relies on the standard that would be applicable if XL had a duty to defend Belsen Getty in attempting to place burdens on XL that XL did not owe. (*See* Dkt. Nos. 56, 66). For example, Mr. Humpherys opines that XL had an obligation to settle any claim that had arguable merit. As explained, XL had no such obligation under the plain terms of the Policy because Belsen Getty at all times retained the authority to negotiate on its own behalf. Similarly, to the extent Mr. Humpherys opines that XL acted in bad faith because it did not obtain a coverage opinion from outside counsel before denying the claim, the Utah Supreme Court has rejected a similar argument. *See Black v. Allstate Ins. Co.*, 2004 UT 66, 100 P.3d 1163, 1169 n.3 ("[T]he use of an independent adjustor, while advisable, is not necessarily required in order for an insurer to demonstrate that it has fulfilled its good faith duty to investigate and fairly evaluate the claims."). Thus, Mr. Humpherys's opinion does not provide a basis from which a reasonable jury could conclude that XL breached the implied covenant of good faith and fair dealing or that it breached its fiduciary obligations.

[22] The court does not have any pending claim before it for payment within the Policy Limits and makes no determination of whether such payment is required or may be precluded by any other Policy exclusions.

BY THE COURT:

Clark Waddoups
United States District Judge